No objections to this Report and Recommendation (the "R&R") have been received, so I review it for clear error. Finding no error, clear or otherwise, I adopt the R&R as the decision of the Court. Plaintiff's motion for judgment on the pleadings is denied, and the Commissioner's cross-motion for judgment on the pleadings is granted. The Clerk shall close the case.

SO ORDERED.

*Cathy Seibel*                    1/6/23

CATHY SEIBEL, U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BENITA WILLIAMS,

                          Plaintiff,

             -against-

KILOLO KIJAKAZI,[1]
ACTING COMMISSIONER OF SOCIAL SECURITY,

                       Defendant.
------------------------------------------------------------X

**REPORT AND RECOMMENDATION**

21 Civ. 5252 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

      Plaintiff Benita Williams ("Plaintiff") commenced this action on June 14, 2021 pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security (the "Commissioner"), which found Plaintiff not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act. (Dkt. No. 1). Presently before the Court are: (1) Plaintiff's "motion for summary judgment on the pleadings" pursuant to Rule 56(a)[2] of the Federal Rules of Civil Procedure, (Dkt. No. 12), accompanied by a memorandum of law, (Dkt. No. 13) ("Pl. Br."); and (2) the Commissioner's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Dkt. No. 14), accompanied by a memorandum of law, (Dkt. No. 15) ("Comm'r Br."). For the reasons set forth

---

[1] Acting Commissioner of Social Security, Dr. Kilolo Kijakazi, is substituted for former Commissioner Andrew Saul as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Plaintiff refers to her motion as one seeking summary judgment pursuant to Fed. R. Civ. P. 56(a). However, it appears to be a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Regardless, "[g]iven the nature of the proceedings — an action to review a final decision of the Commissioner — it makes no difference" whether Plaintiff's motion is considered "to be a motion for judgment on the pleadings or a motion for summary judgment." *Monroe v. Berryhill*, 17-CV-3373 (ER) (HBP), 2018 WL 3912255, at *1 n.2 (S.D.N.Y. July 24, 2018).

herein, I respectfully recommend that Plaintiff's motion for judgment on the pleadings be denied and the Commissioner's cross-motion be granted.

## I. BACKGROUND

Plaintiff was born on October 21, 1969. (R.[3] 164).  Plaintiff applied for DIB on June 20, 2019, alleging a disability onset date of February 27, 2018. (*Id*.).  On September 12, 2019, Plaintiff's claim was initially denied. (R. 94-105).  Plaintiff subsequently requested reconsideration (R. 106).  On February 20, 2020, Plaintiff was awarded retroactive benefits beginning on October 20, 2019—the date when Plaintiff's age category changed. (R. 107-08).[4] Plaintiff then requested an administrative hearing to review the denial of her DIB claim from February 27, 2018 through October 19, 2019. (R. 110).  On October 26, 2020, Administrative Law Judge Sharda Singh ("ALJ" or "ALJ Singh") held a hearing. (R. 38-60).  ALJ Singh issued a written decision on November 6, 2020, finding that Plaintiff was not disabled from February 27, 2018 through October 19, 2019, and was thus not entitled to DIB during that time. (R. 12-33).  Plaintiff requested review by the Appeals Council, which denied her request on April 15, 2021, (R. 1-6), making the ALJ's decision ripe for review.

### A.  Medical Evidence Relating to Plaintiff's Physical Impairments

### 1.  Medical Evidence Before the Disability Onset Date

### i.  Emergency Room Visit – St. John's Riverside Hospital

On November 15, 2017, Plaintiff visited the emergency room at St. John's Riverside Hospital regarding pain in her right knee stemming from a "twisting injury at work" the day

---

[3] Refers to the certified administrative record of proceedings relating to Plaintiff's application for social security benefits, filed in this action on December 16, 2021. (Dkt. No. 11).  All page number citations to the certified administrative record refer to the page number assigned by the Social Security Administration ("SSA").

[4] As noted in the ALJ's decision, Plaintiff was granted DIB benefits beginning on October 20, 2019 "which represented [Plaintiff's] fiftieth birthday." (R. 15).

prior. (R. 260-63).  Plaintiff reported that, since the injury, her knee had "become swollen and painful." (R. 261).  Rebecca Sciliano, P.A., noted that Plaintiff was able to ambulate with her knee and discharged Plaintiff with a suspected knee sprain. (R. 263).

## ii. Magnetic Resonance Imaging ("MRI") – Stand Up MRI of Yonkers

An MRI was conducted of Plaintiff's right knee on December 31, 2017. (R. 267-69). Plaintiff presented with right knee pain, clicking, swelling and difficulty walking. (R. 268).  The MRI revealed a horizontal tear involving the body-anterior horn junction of the lateral meniscus extending to the superior meniscal surface, free edge truncation of the lateral meniscal body, and an obliquely oriented tear extending to the inferior meniscal surface at the junction of the middle and peripheral third, extending in close proximity to the popliteus hiatus at the body-posterior horn junction. (R. 269).  The MRI also revealed the following findings: (i) an anterior cruciate ligament strain and pericruciate edema; (ii) edema deep in the lateral joint capsule with bulging of the capsule outward; (iii) synovial effusion distending the suprapatella bursa with synovitis; (iv) edema in the prepatellar subcutaneous tissues; (v) a small poplitcal cyst tracking superiorly from the joint line; and (vi) medial tibial plateau spur formation and lateral tibiofemoral spur formation. (R. 268-69).

## iii. Dr. David E. Lent, M.D., F.A.A.O.S.

On January 10, 2018, Plaintiff sought treatment for right knee pain from Dr. David E. Lent. (R. 265).  Dr. Lent noted that her MRI revealed "a large lateral meniscus tear and a strain of [Plaintiff's] ACL." (*Id*.).  Dr. Lent listed the following impressions from Plaintiff's physical exam: (i) significant tenderness laterally; (ii) a "positive Lachman" maneuver test that came to an endpoint; and (iii) no pivot shift and no instability while walking. (*Id*.).  Dr. Lent recommended

performing a right arthroscopy and meniscectomy of the right knee, to be followed by rehabilitation, and was hopeful Plaintiff would make a full recovery. (*Id.*).

### iv. Dr. Michael Cushner, M.D. – WestMed Medical Group

On June 15, 2017, Plaintiff consulted Dr. Michael Cushner regarding left hand pain and numbness. (R. 482). She stated that her pain began after her hand was crushed between a student and a metal beam when she was trying to break up a fight between two students at work. (*Id.*). Plaintiff informed Dr. Cushner that X-rays had been taken, which came back normal. (*Id.*). Dr. Cushner prescribed a wrist brace and topical pain gel. (R. 485).

Plaintiff visited Dr. Cushner again on February 5, 2018 regarding workers' compensation for a right knee injury that occurred "while doing a therapeutic restrain[t]." (R. 370). She presented with swelling and pain in her right knee, for which she had previously sought evaluation at St. John's Riverside Hospital Emergency Department. (*Id.*). Plaintiff reported intermittent, throbbing pain in the anterior of her knee, which could sometimes travel to the back, and got worse with activities and sometimes at night. (*Id.*). Plaintiff denied any numbness and tingling and, at that time, was not taking any medication for her injury. (*Id.*). Dr. Cushner also noted that he had reviewed the findings of the MRI conducted on December 31, 2017. (R. 373). Dr. Cushner diagnosed an internal derangement of the right knee and discussed a right knee arthroscopy, as well as other surgical and non-surgical treatment options. (R. 373-74).

### 2. Medical Evidence After the Disability Onset Date

### i. Rye Ambulatory Surgery Center

On February 28, 2018, Dr. Cushner performed surgery on Plaintiff's right knee. (R. 376-77). Specifically, Dr. Cushner performed: (1) an arthroscopy with partial meniscectomy medial and lateral meniscus; (2) an arthroscopy with chondroplasty and abrasoplasty; and (3) an

anthroscopy with synovectomy, including removal of medial plica. (R. 376).  Plaintiff's post and

pre-operative diagnoses were: (1) right knee medial and lateral meniscal tear; (2) right knee

cartilage injury; and (3) right knee synovitis. (*Id*.).  Following her surgery, Plaintiff was

discharged without complication. (R. 377).

### ii. Burke Rehabilitation & Research

From April 9, 2018 through June 4, 2018, Plaintiff sought outpatient treatment at Burke

Rehabilitation & Research. (R. 271-308, 673-75).  During these visits, Plaintiff reported that her

right knee pain was an 8/10 at its worst when standing or laying for long periods of time, (R.

271, 274, 277, 280, 283, 285, 288, 293, 295, 297, 299, 301, 303, 305, 307, 673), and a 3/10 at its

best, with ibuprofen, (R. 271, 274, 277, 280, 283, 285, 288, 293, 295, 297, 299, 301, 303, 305,

307, 673).  At most of the visits, Plaintiff did not appear to be in distress and was able to

ambulate. (R. 274, 277, 280, 285, 288, 297, 301, 303, 307, 673).  On April 9, 2018, Plaintiff

reported that she had received a cortisone injection from Dr. Cushner, which enabled her to

"tolerate some bending and walking." (R. 287).  That same day, Plaintiff stated that she needed

to use a cane and that she was able to stand for one hour before an increase in pain and 20

minutes before needing to sit and rest. (*Id*.).

Although she experienced "audible popping without pain" during her exercises, Plaintiff

began to note improved tolerance for activities during her session on April 18, 2018. (R. 281).

On April 27, 2018, Plaintiff reported that she was "gradually weaning off of the cane" as per her

doctor's request and that it was her "first day without" the cane. (R. 274).  On May 2, 2018,

Plaintiff stated that her pain was slightly better, but that she still had knee pain. (R. 307).  On

May 7, 2018, Plaintiff indicated that her knee still "throb[bed] at night" and that she still

experienced pain during the day, but "trie[d] to push through it." (R. 305).  On May 14, 2018,

Plaintiff's physical therapist noted poor knee extension range of motion. (R. 302).   On May 23, 2018, Plaintiff stated that she had "medial knee pain," and was frustrated due to lack of progress. (R. 297).   On May 30, 2018, Plaintiff indicated that she was "having good and bad days," and that she had a doctor's appointment the following week. (R. 293).   On June 4, 2018, Plaintiff said her symptoms were the same and she was able to ambulate without an assistive device. (R. 673).

### iii.  Dr. Michael Cushner, M.D. – WestMed Medical Group

Plaintiff had several follow-up visits with Dr. Cushner between March 19, 2018 and August 12, 2019 regarding her knee surgery. (R. 309-480, 556-59, 679-93).   On March 19, 2018, Plaintiff indicated that her knee was feeling better but was still "achy." (R. 388).   Plaintiff additionally stated that she had been walking but not bending her knee frequently. (*Id*.).   Dr. Cushner discussed with Plaintiff the need to attend physical therapy to move her knee, and he provided a cortisone injection to help with her motion. (R. 391).   On April 24, 2018, Plaintiff again sought follow-up treatment from Dr. Cushner. (R. 396).   During that visit, Plaintiff noted improvements in her range of motion from attending physiotherapy, but said she continued to experience "stiffness of the knee and weakness." (R. 399).   During a follow-up visit on June 5, 2018, Plaintiff reported decreased range of motion and stiffness in her knee. (R. 404).   She additionally stated that she was experiencing "slow progress" with physiotherapy, "continue[d] to feel weakness to the leg," and had improved only for a short time following the cortisone injection. (*Id*.).   At that time, ibuprofen provided "transient relief." (*Id*.).   Dr. Cushner prescribed pain medication to treat her symptoms and administered another cortisone injection. (R. 407-08).   During visits on July 10 and 31, 2018, the records noted swelling to Plaintiff's knee, pain with walking for periods of time and prolonged standing, and pain with transitioning from sitting to standing. (R. 409, 413).

During her visit on July 31, 2018, Dr. Cushner noted Plaintiff had a contusion on her left hand. (R. 417).  On August 16, 2018, Plaintiff reported pain in her left hand after it was "crushed between a student and a metal be[a]m" while she was "trying to prevent a student from attacking another student." (R. 314).  Plaintiff stated that she had gone to urgent care for her pain and that the X-rays of her left hand "were normal." (*Id*.).  She stated that her hand felt "much better," but she continued to experience "tenderness along the ulnar aspect of the hand." (*Id*.).

On August 28, September 26, and October 25, 2018, Plaintiff reported continued swelling and stiffness in her knee, particularly during her first few steps when immobile for any period of time. (R. 422-23, 428).  Dr. Cushner prescribed pain medications and discussed other treatments, including stretching, additional injections, and physiotherapy. (R. 426, 431).  On January 10, 2019, Plaintiff reported cracking and popping in her knee and pain with twisting motions, prolonged walking, and other activities. (R. 432).  Plaintiff also stated that physiotherapy had helped strengthen her knee. (*Id*.).  Dr. Cushner ordered an updated MRI of Plaintiff's knee and discussed continued treatment via medications, stretching and injections. (R. 434).  Plaintiff continued to report knee pain at her visits on February 11, February 28, March 12, and March 29, 2019. (R. 435-36, 440, 455).  Dr. Cushner diagnosed Plaintiff with arthritis in her right knee. (R. 438, 443, 449).  Plaintiff received hyaluronic acid injections in her right knee on February 28, March 12, and March 29, 2019. (R. 443, 449, 458).  On August 12, 2019, Plaintiff stated that the hyaluronic acid injections had helped ease her pain for a month, but she continued to experience swelling, pain with standing and walking for periods of time, difficulty standing up from a seated position, and trouble sleeping due to her pain. (R. 556).  Dr. Cushner prescribed ibuprofen and discussed other treatment methods, including home exercises, stretching and activities as tolerated. (R. 559).

### iv.  Dr. Lawrence Schulman – Independent Medical Examinations in Connection With New York State Workers' Compensation Claim

Dr. Lawrence Schulman conducted independent medical examinations of Plaintiff on April 10, June 26, and December 6, 2018, and April 16, 2019. (R. 595-618).  During the April 10, 2018 examination, Plaintiff complained that her knee remained painful, was swollen, and she had problems with prolonged standing and walking. (R. 596).  She also reported difficulty going up and down stairs and that she had "crackling and popping" in her right knee. (*Id*.).  During that visit, Plaintiff ambulated with a cane. (*Id*.).  On physical examination, Dr. Schulman noted: (1) a genu valgum deformity in the right knee; (2) swelling in the right knee; (3) inability to fully extend the right knee and limited ability to flex the right knee; (4) no instability of the right knee; (5) pain and tenderness along the medial parapatellar facets; (6) painful transverse and longitudinal motion of the patella; and (7) marked tenderness over the medial and lateral joint lines and the popliteal areas medially and laterally. (R. 597).  Plaintiff did not have tenderness over the medial or lateral femoral condyles or the tibial plateaus, and her medial and lateral collateral ligaments were stable to stress. (*Id*.).

Based on this examination, Dr. Schulman diagnosed Plaintiff with traumatic internal derangement of the right knee, with lateral and medial meniscal tears and chondromalacia. (*Id*.).  Dr. Schulman also diagnosed Plaintiff with status post-arthroscopy of the right knee, with medial and lateral meniscectomies, chondroplasty, synovectomy, and abrasion arthroplasty of the right knee. (*Id*.)  Dr. Schulman noted Plaintiff had a moderate to marked disability of the right knee and that her prognosis was fair to good. (R. 598).  Dr. Schulman opined that Plaintiff has the capacity for sedentary work on a limited basis (2-3 hours a day), that she cannot do any standing or walking, and she cannot return to full duty at her previous employment. (*Id*.).

On June 26, 2018, Dr. Schulman re-examined Plaintiff. (R. 607). Plaintiff reported that her knee remained painful and swollen, and that she had re-developed symptoms in her right knee, including crepitus, following some temporary relief provided by cortisone injections. (*Id*.). She continued to experience difficulty ascending and descending stairs, as well as with prolonged standing and walking. (*Id*.). Dr. Schulman noted that Plaintiff ambulated with a cane and was not in acute distress. (*Id*.). On physical examination, Plaintiff still had a genu valgum deformity and swelling of the right knee. (*Id*.). Plaintiff was able to fully extend her right knee and her knee was stable. (*Id*.). She continued to have tenderness over the medial joint line and slightly over the lateral joint line, and pain with patellofemoral compression on the right knee. (*Id*.). Based on these findings, Dr. Schulman diagnosed Plaintiff with: (i) traumatic internal derangement of the right knee, with meniscal tears, degenerative joint disease and chondromalacia; and (ii) status post-arthroscopic surgery of the right knee, with persistent degenerative joint changes and chondromalacia. (R. 608). He opined that Plaintiff could not return to her previous work as a school monitor and could only perform sedentary work at that time. (*Id*.). Dr. Schulman noted that Plaintiff exhibited some degenerative changes in her right knee which were most likely permanent and disabling, and recommended re-evaluation once her series of hyaluronic injections was complete. (*Id*.).

Dr. Schulman re-examined Plaintiff on December 6, 2018. (R. 615). He noted that Plaintiff ambulated with a cane and that she reported no significant improvement in her right knee despite physical therapy, pain medication, and injections from Dr. Cushner. (*Id*.). Dr. Schulman indicated that Plaintiff reported persistent pain and swelling in her right knee, and her genu valgum deformity was "increasing." (*Id*.). Plaintiff continued to experience "crepitus and crackling." (*Id*.). She also lacked motion of the right knee, was limited with prolonged standing

and walking, and continued to experience difficulty with going up and down stairs. (*Id*.).  Dr. Schulman further noted Plaintiff was unable to kneel, squat or run, and felt pain when standing up from a seated position. (*Id*.).  Based on these findings, Dr. Schulman diagnosed Plaintiff with status post-traumatic internal derangement of the right knee with meniscal tears, and advanced degenerative joint disease of the right knee with genu valgum deformity. (R. 616).  Dr. Schulman opined that Plaintiff was unable to do her previous work as a monitor, could not engage in any prolonged standing or walking, and had minimal ability to walk and stand. (R. 617).

Dr. Schulman re-examined Plaintiff on April 16, 2019. (R. 601).  Plaintiff reported persistent pain, swelling and crepitus in her right knee. (*Id*.).  She used a cane outdoors, was limited with going up and down steps, experienced pain with prolonged standing, walking and getting up from a chair, and could not run, kneel or squat. (*Id*.).  Plaintiff did not experience instability with the right knee and presented no issues with her left knee. (*Id*.).  On physical examination, Dr. Schulman noted the following: a genu valgum deformity of the right knee; 1/2 inch swelling in the right knee as compared to the left; a five-degree limit of extension and limited flexation with the right knee; no instability of the right knee; pain with patellofemoral compression on the right and peripatellar tenderness; tenderness on the right medial joint line and medial tibial plateau; and pain and swelling over the medial popliteal area. (*Id*.).  Plaintiff had positive motion of the patella on the right, did not have instability of the medial or lateral collateral ligaments, and her meniscal signs were negative. (R. 601-02).  On the basis of these findings, Dr. Schulman diagnosed Plaintiff with traumatic internal derangement of the right knee with meniscal tears and advanced degenerative joint disease of the right knee with genu valgum deformity. (R. 602).

### v. Federal Governmental Consultative Examination – Dr. Michael Healy

On July 31, 2019, Dr. Michael Healy performed an orthopedic consultative examination of Plaintiff at the request of the Social Security Administration ("SSA"). (R. 679). Plaintiff's chief complaint was pain in her right knee, from which she claimed she got no relief from surgery and injections. (*Id.*). Plaintiff also said she had a history of asthma. (*Id.*). Plaintiff reported difficulty with walking or weight bearing without using a cane, and intermittent swelling. (*Id.*). At that time, her symptoms were managed with medications. (R. 679-80). She required help completing household chores, but was able to shower and dress herself. (R. 680). Dr. Healy observed Plaintiff to be in mild discomfort with a widened gait and shortened strides. (*Id.*). She was not able to walk on the right heel or toes. (*Id.*). Plaintiff used a prescribed cane in order to help with weightbearing and pain in the right knee; Dr. Healy opined that the cane was medically necessary and noted Plaintiff had less pain, a longer stride, and a narrower gait when using it. (*Id.*). Dr. Healy also noted that Plaintiff could not rise from a chair without difficulty. (*Id.*).

Dr. Healy stated that Plaintiff's hand and finger dexterity was intact in both hands and she had 5/5 grip strength bilaterally. (*Id.*). In her lower extremities, Plaintiff had a decreased range of motion of the right knee with a flexion and extension of less than 30 degrees, and severe pain. (R. 681). The right knee was palpably tender. (*Id.*). Plaintiff had full range of motion with her left knee. (*Id.*). Plaintiff had decreased strength with her right lower extremity, and normal strength with her left lower extremity. (*Id.*). She did not have muscle atrophy, sensory abnormality, joint effusion, inflammation or instability. (*Id.*).

Based on these findings, Dr. Healy diagnosed Plaintiff with right knee pain, with a known history of anterior cruciate ligament damage, as well as previous arthroscopic repair with

residual pain, and a history of asthma. (*Id*.). Dr. Healy opined that Plaintiff had moderate to marked limitations with sitting, standing, walking and climbing stairs. (R. 682). He also recommended that she avoid exposure to respiratory irritants, dust and smoke. (*Id*.).

### vi. X-ray – The IMA Group

An X-ray of Plaintiff's right knee taken on August 15, 2019 demonstrated no evidence of acute fracture, dislocation or destructive bony lesion. (R. 683). The impression demonstrated small joint effusion, mild patellofemoral joint space narrowing with small posterior patellar spurring, and mild tibiofemoral joint space narrowing with small marginal osteophyte formation. (*Id*.).

### vii. St. John's Riverside Hospital

On July 4, 2019, Plaintiff sought emergency treatment at St. John's Riverside Hospital for a left eye injury. (R. 697-98). Plaintiff reported that she was punched in the eye two days prior. (R. 698). She had no changes in vision, and had mild discomfort when she moved her eye. (*Id*.). She did not report losing consciousness, headache, nausea, vomiting or visual changes resulting from her injury. (*Id*.). A CT scan revealed acute, bilateral displaced nasal fractures; a fracture line traversing the nasal bridge; and a possible subtle non-displaced fracture involving the osseous nasal septum ventrally. (R. 704). Plaintiff was discharged in stable condition with instructions to consult an ophthalmologist or facial surgeon as needed and to take over-the-counter pain medication. (R. 700).

### viii. MRI – Stand-Up MRI of Yonkers

An MRI was performed of Plaintiff's right knee on January 28, 2020. (R. 720). Plaintiff presented with right knee pain and difficulty walking. (*Id*.). Plaintiff again had synovial fluid at the level of the patellofemoral articulation, and mild insertional patellar tendinosis with a

persisting edema in the prepatellar subcutaneous tissues. (*Id*.). The image also demonstrated patellofemoral spur formation and progressing attenuation of the anterior cruciate ligament, particularly involving its posterolateral bundle, with partial tearing. (*Id*.). The MRI revealed the following impressions: (1) progressive abnormality at the lateral tibiofemoral joint compartment; (2) progressing lateral tibiofemoral chondromalacia and bone-on-bone contact of the lateral tibiofemoral articular surfaces; (3) subcortical sclerosis; (4) capsular edema bulging the lateral joint capsule outward; (5) intracapsular popliteus tendinosis/tendinopathy; (6) fibular collateral ligament displaced away from the joint; (7) medial patellar chondromalacia; (8) popliteus tenosynovitis; and (9) progressing medial tibiofemoral spur formation and advanced lateral tibiofemoral spur formation. (R. 721-22).

### ix.  State Agency Medical Consultant – Dr. C. Li

On September 9, 2019, Dr. C. Li reviewed Plaintiff's medical treatment records. (R. 62-68). Dr. Li opined that Plaintiff had the following exertional limitations based on Plaintiff's right knee pain and surgery: (1) Plaintiff was limited to occasional lifting/carrying of no more than ten pounds; (2) Plaintiff could frequently lift/carry less than ten pounds; (3) Plaintiff could stand and/or walk for a total of two hours in an eight-hour workday; (4) Plaintiff required a medically required hand-held device for ambulation; (5) Plaintiff could sit for six hours in an eight-hour workday; (6) Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. 65-66). Dr. Li did not assess any manipulative or visual limitations. (R. 66).

### x.  State Agency Medical Consultant – Dr. D. Schwartz

On January 17, 2020, state agency consultant Dr. D. Schwartz reviewed Plaintiff's medical records. (R. 80). Dr. Schwartz opined that Plaintiff had the following exertional

limitations based on Plaintiff's right knee pain and surgery: (1) Plaintiff was limited to occasional lifting/carrying of no more than ten pounds; (2) Plaintiff could frequently lift/carry less than ten pounds; (3) Plaintiff could stand and/or walk for a total of two hours in an eight-hour workday; (4) Plaintiff required a medically required hand-held device for ambulation; (5) Plaintiff could sit for about six hours in an eight-hour workday; and (6) Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. 78-79).  Dr. Schulman did not assess any limitations as to pushing or pulling. (R. 79).

**xi. State Agency Medical Consultant – Dr. H. Blumenfeld**

On February 18, 2020, state agency medical consultant Dr. H. Blumenfeld reviewed Plaintiff's medical records. (R. 80-84).  Dr. Blumenfeld's opinion did not differ significantly from Dr. Schwartz's opinion.  Dr. Blumenfeld found that Plaintiff had the following exertional limitations based on Plaintiff's right knee pain and surgery: (1) Plaintiff was limited to occasional lifting/carrying of no more than ten pounds; (2) Plaintiff could frequently lift/carry five pounds; (3) Plaintiff could stand and/or walk for a total of two hours in an eight-hour workday; (4) Plaintiff required a medically required hand-held device for ambulation; (5) Plaintiff could sit for about six hours in an eight-hour workday; (6) Plaintiff was limited to occasional climbing (except never ladders, ropes or scaffolds), balancing, stooping, kneeling, crouching and crawling. (R. 80-81).  Dr. Blumenfeld further opined that Plaintiff had limited ability to push and/or pull in the right extremity and required a cane for all outside walking. (R. 81).  Because of Plaintiff's asthma, Dr. Blumenfeld found that Plaintiff should avoid concentrated exposure to extreme cold and fumes, odors, dusts, gases and poor ventilation. (R. 81-82).  Dr. Blumenfeld concluded that Plaintiff was disabled as of October 20, 2019, when Plaintiff's age category changed under the medical vocational rules. (R. 83-84).

**B. Nonmedical Evidence**

**1. Plaintiff's Function Report**

On July 17, 2019, Plaintiff completed a function report. (R. 195-204).  Plaintiff indicated

that she experienced pain in her right knee. (R. 203).  At that time, she was managing her pain

with ibuprofen. (*Id.*).  Plaintiff reported that her injury caused her to need assistance caring for

her two children, shopping, walking, and getting in and out of chairs, bed and the car. (R. 195-

96).  She stated that she needed to reposition herself throughout the night to alleviate the pain.

(R. 196).  Plaintiff also noted difficulty in dressing, bathing, cooking and using the restroom. (R.

196-97).  With respect to her physical abilities, Plaintiff said that: (1) she was unable to lift

anything heavy because she could not bend her knees to lift properly; (2) she is unable to stand

for more than ten minutes; (3) she could not walk more than one mile without her knee swelling;

(4) she could not sit longer than a half hour without throbbing pain; (5) she could climb stairs

very slowly but experiences pops and pain in her knee; (6) she was able to kneel slowly for a few

minutes with pain; (7) she could not do a complete squat; and (8) she could not reach far without

feeling a stretch in her knee. (R. 200).  Plaintiff indicated that she used a cane. (R. 201).  She

stated that she can use her hands, see, hear and talk normally. (R. 200-01).

**2. Plaintiff's Testimony**

Yocasta Duran represented Plaintiff at her October 26, 2020 telephonic hearing. (R. 41).

Plaintiff testified that she lived in an apartment during the relevant time period and experienced

problems going up and down the stairs due to her knee. (R. 43-44).  Plaintiff would try to use the

railings to shift weight from her right to her left leg to support her going up the stairs. (R. 44).

For a short period following her surgery, she was not able to bathe and dress herself or complete

basic household tasks, and had an aide to assist her. (*Id.*).  The aide assisted her for

approximately five months. (R. 50). Plaintiff previously worked as a security guard and security guard support staff. (R. 45, 56). She would typically be on her feet "all day" from eight to eleven hours and would be required to lift over 100 pounds. (R. 45). She testified that she could no longer perform the physical demands of that job due to fear of injuring her knee again. (*Id.*).

Since the time she left her prior employment, her typical day would entail sending her kids to school, going to therapy, and otherwise keeping her leg elevated in order to ease swelling. (R. 45-46). She was prescribed pain medication to ease her symptoms. (R. 46). Plaintiff used a cane daily to assist with balance. (R. 47). Plaintiff was able to stand for 20-25 minutes before experiencing pain and needing to sit down. (*Id.*). She could walk about two blocks without experiencing pain, and lift up to two gallons of milk, but had problems with kneeling and bending. (R. 47-48). Plaintiff struggled to concentrate when in pain and had difficulty sleeping. (R. 48-49). By the end of the night, her leg would swell up. (R. 49).

Plaintiff experienced short periods of relief following injections from her doctor. (R. 50). However, once the injections wore off, her pain resumed, and her doctors informed her she had reached the maximum amount of injections. (*Id.*). Plaintiff also took prescribed pain medication for a period of time. (*Id.*). Plaintiff was able to do short periods of light cleaning and cooking. (R. 51). She was able to drive herself to the doctor some of the time, but would need to put her car on cruise control when her leg stiffened up and cramped. (R. 52). She was not able to attend social activities, including attending religious services, because the seating "was going to be too rough on [her] knees." (R. 53). Plaintiff further explained that she could not take any long-distance trips or vacations. (*Id.*).

Plaintiff previously worked at Cedar Knolls Union as a school security guard. (R. 54). That position required her to stand all day and use physical restraint up to 200 pounds when students were "making it unsafe for themselves or the staff." (*Id.*).

### 3. Vocational Expert Testimony

Vocational Expert ("VE") Andrew Vaughan ("VE Vaughan") testified at Plaintiff's hearing. (R. 54). VE Vaughan confirmed that he had reviewed the exhibits provided and familiarized himself with Plaintiff's vocational background prior to the hearing, and he had also listened to Plaintiff's testimony. (R. 55). The ALJ told VE Vaughan to alert him if any of his testimony conflicted with the DOT. (*Id.*).

VE Vaughan testified that Plaintiff's prior employment as a security guard would be performed at a light exertional level. (R. 56). The ALJ posed a hypothetical to VE Vaughan, asking him to assume an individual with Plaintiff's age, education, and work experience who can perform the full range of sedentary work, as defined in the Dictionary of Occupational Titles ("DOT"), except that she can never climb ladders, ropes or scaffolds and could only occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl. (R. 57). The individual would also need to use a cane in the right dominant hand for balance. (*Id.*). Further, the individual must also avoid certain environmental restrictions including fumes, odors, dust and gases. (*Id.*). VE Vaughan testified that such an individual would not be able to perform any of Plaintiff's past work. (*Id.*). However, VE Vaughan testified that such an individual would be able to perform the following jobs at a sedentary exertional level: addressing clerk, cutter and paster, and call-out operator. (*Id.*). VE Vaughan further testified that if such an individual needed to take unscheduled breaks outside of normal break hours, resulting in the individual being off-task for more than 15 percent of the work day, they would not be able to perform any of Plaintiff's past

work or any other sedentary jobs at the unskilled level. (R. 57-58).  VE Vaughan confirmed that his testimony was consistent with the DOT, except for his testimony regarding an individual being off-task, which was not contained in the DOT but was derived from his training and professional experience. (R. 58).

When questioned by Plaintiff's representative, VE Vaughan testified that an individual who needed to stand five minutes for every 30 minutes sitting would still be able to perform the three jobs identified. (*Id*.).  VE Vaughan further confirmed that the three identified jobs could still be performed if the individual could never climb stairs, kneel, bend or stoop. (*Id*.).  However, if the individual needed to miss work at least two times a month, they would be unable to secure full-time competitive employment at the unskilled level. (R. 58-59).

## C.  The ALJ's Decision

ALJ Singh first determined that Plaintiff met the insured status requirements of the Social Security Act ("Act") through December 31, 2023. (R. 17).  Thereafter, ALJ Singh applied the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). (R. 17-28).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from February 27, 2018, the alleged onset date, through October 19, 2019. (R. 17).  At step two, the ALJ determined that, from February 28, 2018 through October 19, 2019, Plaintiff had the severe impairments of right knee medial and lateral meniscal tear, cartilage injury and synovitis, requiring right knee arthroscopy, partial meniscectomy and medial and lateral meniscus surgery on February 28, 2018; right knee arthritis; and asthma. (R. 17-18).  The ALJ determined that Plaintiff's obesity was a non-severe impairment because the record contained "no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning," nor did it contain evidence that

Plaintiff sought treatment from a bariatric or other specialist or required surgical intervention for her obesity. (R. 18).  ALJ Singh noted that Plaintiff's weight, including its potential impact on her other impairments, had been considered within the limitations of Plaintiff's residual functional capacity ("RFC"). (*Id*.).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. 18).

The ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that "she could never climb ladders, ropes, or scaffolds," and "could occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl." (R. 19). Plaintiff also "needed to use a cane in the right, dominant hand for balance." (*Id*.).  Plaintiff was "further limited to environmental restrictions, such as fumes, odors, dusts, and gases." (*Id*.).  The ALJ considered all of Plaintiff's symptoms and their consistency with the objective medical evidence and other evidence in arriving at the RFC. (*Id*.).  Ultimately, the ALJ concluded that Plaintiff's "medically determinable impairments could have reasonably been expected to cause some of the alleged symptoms," but Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record." (R. 19-20).

The ALJ found the opinion of Dr. Healy "persuasive" as it was supported by the physical examination findings and consistent with the remaining objective evidence in the record. (R. 23). However, the ALJ noted that Dr. Healy's opinion was "a bit vague" because it failed to define what constituted marked to moderate limitations. (R. 23-24).  The ALJ further found the opinion of state agency medical consultant, Dr. Li, "persuasive" since it was consistent with the clinical

evidence, but noted that Plaintiff was slightly more limited than Dr. Li opined because she needed to use a cane in her right dominant hand for balance, and she faced environmental limitations. (R. 25).  Moreover, ALJ Singh determined that the opinions of the state agency medical consultants at the reconsideration level—Dr. Schwartz and Dr. Blumenfeld— were "persuasive" because they were consistent with the clinical evidence demonstrating that Plaintiff was capable of performing sedentary work "with additional postural limitations, environmental limitations, and need to use a cane." (*Id.*).

The ALJ found the opinion of Plaintiff's independent medical examiner, Dr. Schulman, "unpersuasive" because his opinions were vague and conclusory, and he rendered opinions on issues ultimately reserved to the Commissioner, *i.e.*, "the ultimate determination of disability, on the ability to perform past work, and only on the ability to perform sedentary work." (R. 24).  Dr. Schulman's opinion was also inconsistent with and unsupported by the other evidence in the record because the record demonstrated that Plaintiff was not as limited as Dr. Schulman opined, and that, contrary to Dr. Schulman's opinion, she was generally capable of performing sedentary work. (*Id.*).

At step four, the ALJ found that Plaintiff was unable to perform her past relevant work as a security guard from February 27, 2018 through October 19, 2019 because these jobs were precluded by Plaintiff's RFC. (R. 26).  At step five, after considering Plaintiff's RFC, the testimony of the VE, and Plaintiff's age, education and work experience, the ALJ concluded that she was not disabled under the Act because she could make a successful adjustment to perform other work that existed in significant numbers in the national economy. (R. 27).

## II.  DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded for further administrative proceedings because: (1) the ALJ erred in determining that Plaintiff did not suffer from a left-hand impairment; (2) the ALJ incorrectly determined that Plaintiff has the ability to perform other work; (3) the ALJ failed to define Plaintiff's RFC with respect to environmental limitations in specific "work-related" terms; (4) the ALJ erred in finding that Plaintiff can perform sedentary work; (5) the ALJ failed to account for limitations with Plaintiff's left hand and obesity that impacted her ability to do work, in violation of SSR 96-8p; (6) the ALJ incorrectly determined that the jobs of addressing clerk and call-out operator existed in significant numbers in the national economy; and (7) the hypothetical posed by the ALJ did not adequately reflect Plaintiff's limitations, and thus the ALJ could not rely on the VE's testimony. (Pl. Br. at 14-20).  The Commissioner counters that: (1) the ALJ properly determined Plaintiff's severe impairments, as Plaintiff failed to present evidence of left hand or obesity limitations; (2) the ALJ's finding that Plaintiff retained an RFC to do sedentary work with certain limitations is supported by substantial evidence; and (3) the ALJ appropriately relied on the VE's testimony because the hypothetical posed reflected Plaintiff's limitations and the identified jobs existed in significant numbers in the national economy. (Comm'r Br. at 13-22).

### A.  Legal Standards

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting 42

U.S.C. § 423(d)(1)(A)).  The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).  The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

When reviewing an appeal from a denial of SSI or disability benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Put another way, a conclusion must be buttressed by "more than a mere scintilla" of record evidence. *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).  The substantial evidence standard is "very

deferential" to the ALJ. *Brault*, 683 F.3d at 448.  The Court does not substitute its judgment for the agency's "or 'determine *de novo* whether [the claimant] is disabled.'" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*

On January 18, 2017, the SSA considerably revised its regulations for evaluating medical evidence.  The rules went into effect on March 27, 2017, and therefore, apply to the instant case. Under the new regulations, the treating physician rule no longer applies. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Therefore, no special deference is given to the treating physician's opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, "[the Commissioner] will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).  The updated regulations also define a "medical opinion" as "a statement from a medical source about what [the claimant] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions ...." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Thus, a medical opinion must discuss both a claimant's limitations and "what [the claimant] is still capable of doing" despite those limitations. *Michael*

-23-

*H. v. Saul*, 20-CV-417 (MAD), 2021 WL 2358257, at *6 (N.D.N.Y. June 9, 2021). Relatedly, conclusory statements by a claimant's provider concerning issues reserved to the Commissioner — for instance, whether the claimant is disabled under the Act — are "inherently neither valuable nor persuasive" and will not be analyzed by the ALJ. 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

## B.  The ALJ's Duty to Develop the Record

Initially, the Court must be satisfied that the record is fully developed before determining whether the Commissioner's decision is supported by substantial evidence. *See Smoker v. Saul*, 19-CV-1539 (AT) (JLC), 2020 WL 2212404, at *9 (S.D.N.Y. May 7, 2020) ("Whether the ALJ has satisfied this duty to develop the record is a threshold question."). "[I]n light of the 'essentially non-adversarial nature of a benefits proceeding[,]'" "[a]n ALJ, unlike a judge at trial, has an affirmative duty to develop the record." *Vega v. Astrue*, No. 08-CV-1525 (LAP) (GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). "This duty is present even when a claimant is represented by counsel." *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004) (summary order). "Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence" is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d. Cir. 1996)); *see also Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order).

Here, the Court finds that there are no obvious gaps in the record.  The record consists of a plethora of medical records, (R. 267-69, 705-06); treatment records, (R. 259-480, 685-93, 695-704; 707-36); outpatient physical therapy records, (R. 270-308, 737-48); Plaintiff's function report, (R. 195-204); medical opinions from multiple consultative examiners and state agency consultants, (R. 481-684); and Plaintiff's testimony, (R. 43-56).  Moreover, at the hearing, Plaintiff's representative did not have any objections to the evidence. (R. 42). *See David B. C. v. Comm'r of Soc. Sec.*, 20-CV-01136 (FJS/TWD), 2021 WL 5769567, at *7 (N.D.N.Y. Dec. 6, 2021) (ALJ fulfilled duty to develop the record where "Plaintiff did not object to the contents of the record or identify any gaps that need to be filled.").  Accordingly, the Court concludes and respectfully recommends finding that the ALJ fulfilled her duty to develop the record.

## C.  Plaintiff's Arguments Regarding the ALJ's Severe Impairment Determinations

Step two requires the Commissioner to "determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities." *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012); *see* 20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is a medically determinable impairment or combination of impairments that "significantly limits [the claimant's] ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).  The Commissioner must "'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.'" *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (summary order) (alteration in original) (quoting 20 C.F.R. § 404.1523).  Plaintiff has the burden at step two of establishing that she has a medically severe impairment or combination of impairments. *Taylor*, 32 F. Supp. 3d at 265; *see also* 20 C.F.R. § 404.1512(a).  "[T]he 'mere presence of a disease or impairment, or establishing that a person has

-25-

been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Taylor*, 32 F. Supp. 3d at 266 (quoting *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y.1995)).

### 1. Plaintiff's Left-Hand Impairment

It is undisputed that the ALJ did not reference a left-hand impairment in her step two analysis.  Plaintiff argues that remand is warranted for further evaluation of Plaintiff's impairments because the ALJ failed to find that she had a left-hand impairment and, therefore, did not adequately account for it in her analysis. (Pl. Br. at 14-15, 18-19).  The Commissioner argues that Plaintiff fails to set forth any "limitations she had attributable to her left hand," and that the mere presence of a condition does not render it severe. (Comm'r Br. at 16).

The record is clear that Plaintiff did not include a left-hand impairment in her application for DIB, (R. 187), or testify regarding such an impairment during her administrative hearing, (R. 43-54).  In her letter brief submitted to the ALJ, Plaintiff listed a "[l]eft[-]hand impairment" amongst her medically determinable impairments, (R. 249), but did not otherwise state any limitations attributable to such impairment, (*see* R. 249-53).  In support, Plaintiff cites certain treatment records from Dr. Cushner, dated June 2017 and August 2018. The June 2017 treatment note falls before the alleged disability onset date of February 27, 2018—the day before she had knee surgery. (R. 249, citing Exs. 5F at 2-5 and 8F at 2-6; Pl. Br. at 14).  "[M]edical evidence that predates the alleged disability onset date is ordinarily not relevant to evaluating a claimant's disability." *Carway v. Colvin*, No. 13-CV-2431 (SAS), 2014 WL 1998238, at *5 (S.D.N.Y. May 14, 2014).  Dr. Cushner's August 2018 note indicates a "100%" temporary impairment, and that she still had pain "along the ulnar aspect of the hand" from the June 2017 accident, but her hand had "gotten much better." (R. 487-88).  The ALJ noted that these exhibits were "inherently

neither valuable nor persuasive" under 20 C.F.R. §§ 404.1520b(c) and 416.920b(c) because they opined on "issues reserved to the Commissioner," including conclusions regarding "percentages of temporary and permanent impairments" and about being "generally unable to work." (R. 25). The remainder of the record, including the multiple consultative examination reports, does not reference a left-hand impairment.  In short, Plaintiff did not meet her burden of demonstrating that her left-hand impairment constituted a severe impairment. *See Stephen A. v. Comm'r of Soc. Sec.*, 19-CV-1679 (CJS), 2021 WL 1099617, at *4 (W.D.N.Y. Mar. 23, 2021) (no step two violation where "Plaintiff did not allege the impairment in his original disability application," "the impairment is not mentioned in the report of the consultative medical examiner," and "there [we]re no updated treatment notes to suggest [the impairment] is an ongoing or functionally limiting impairment").

Even assuming, *arguendo*, the left-hand contusion was a severe impairment, the ALJ's failure to include it at step two was harmless error. *See O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (summary order); *see* 42 U.S.C. § 423(d)(2)(B).  An error at step two is "harmless when an ALJ identifies other severe impairments, proceeds past step two, and considers the effects of all the claimant's impairments through the remainder of the sequential evaluation." *Jaleesa H. v. Comm'r of Soc. Sec.*, 580 F. Supp. 3d 1, 6 (W.D.N.Y. 2022) (citing *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order)).  Here, the ALJ noted that Plaintiff's "other body systems…ha[d] been considered within the limitations of the [Plaintiff's] residual functional capacity." (R. 18)  Moreover, the ALJ stated that "good physical examination results with Dr. Healy included intact hand and finger dexterity [and] full grip strength bilaterally," Plaintiff had "full range of motion of…wrists [and] fingers," and Plaintiff had full muscle strength, normal reflexes, and no sensory abnormalities of her upper extremities.

(R. 23).  The ALJ further noted that she had considered "all symptoms" and that the RFC determination was supported by the "entire record" of "claimant's alleged impairments, both severe and non-severe." (R. 19, 26).  Therefore, the Court concludes and respectfully recommends finding that the ALJ analyzed the effect or limitation of any alleged left-hand impairment and its omission at step two was harmless error. *O'Connell*, 558 F. App'x at 65; *Reices-Colon*, 523 F. App'x at 798; *Femminella v. Comm'r of Soc. Sec.*, 524 F. Supp. 3d 20, 21-22 (E.D.N.Y. 2021) ("Although the ALJ did not specifically identify plaintiff's carpal-tunnel syndrome in his analysis under the subsequent steps, because he clearly considered its 'claimed effects…in determining [Plaintiff's] residual functional capacity,' any error was harmless.") (quoting *O'Brien v. Berryhill,* 19-CV-1359 (BMC), 2020 WL 2329446, * 2 (E.D.N.Y. May 11, 2020)); *see also Woodmancy v. Colvin*, 577 F. App'x 72, 74 n.1 (2d Cir. 2014) (summary order) (no error warranting remand where "the ALJ did identify severe impairments at step two, so [plaintiff's] claim proceeded through the sequential evaluation process, in which all of [plaintiff's] ailments were part of the analysis"); *Coard Adukpo v. Berryhill*, 19-CV-2709 (BMC), 2020 WL 3410333, *5 (E.D.N.Y. June 22, 2020) ("Even if the ALJ erred by not finding these other impairments to be severe, she did in fact consider all of these symptoms during subsequent steps in her analysis for plaintiff's other severe impairments.").

## 2. Plaintiff's Obesity

Plaintiff also argues that the ALJ failed to "adequately account" for her obesity. (Pl. Br. at 18-19).  The Commissioner replies that the ALJ did account for Plaintiff's obesity and that, in any event, she has failed to set forth any functional limitations connected to her obesity that affect her ability to do basic work activities. (Comm'r Br. at 13-15).

Here, the ALJ found that Plaintiff's obesity was a non-severe impairment. (R. 18).  The ALJ said that she "considered the potential impact of obesity in causing or contributing to co-existing impairments." (*Id.*).  The ALJ noted that "the record contain[ed] no evidence of any specific or quantifiable impact on pulmonary, musculoskeletal, endocrine, or cardiac functioning," or that Plaintiff "required any surgical intervention in connection with her obesity, as well as no evidence of any ongoing treatment with a bariatric specialist or other specialist." (*Id.*).  The ALJ then stated that "[t]he claimant's weight, including the impact of the claimant's obesity on the claimant's ability to ambulate…has been considered within the limitations of the claimant's [RFC]." (*Id.*).  This determination was consistent with the record, which was devoid of evidence that Plaintiff suffered from functional limitations specific to her obesity. (*See*, *e.g.*, R. 76 (Dr. Blumenfeld noting that "[o]besity considered, but adds very little")).  Furthermore, Plaintiff did not claim that there were any gaps in the record. (R. 42).  Moreover, Plaintiff does not specify what limitations her obesity caused that impacted her ability to perform basic work activities, or offer support for her argument that the ALJ's consideration of her obesity was inadequate. (*See* Pl. Br. at 18-19).  Accordingly, the Court concludes and respectfully recommends finding that the ALJ's determination that Plaintiff's obesity was non-severe was supported by substantial evidence and no reversible error occurred. *See Acevedo v. Saul*, 577 F. Supp. 3d 237, 247 (S.D.N.Y. 2021) (upholding non-severe obesity determination where "[t]he ALJ's finding that [plaintiff's] obesity was not severe was [] supported by the record, which was devoid of even a suggestion that [plaintiff's] obesity caused any functional limitations").

## D.  Plaintiff's Arguments Regarding the RFC Determination

The RFC is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52

(2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)) (internal quotations omitted). The RFC determination is reserved to the Commissioner. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 9 (2d Cir. 2017) (summary order); *see* 20 C.F.R. § 404.1527(d)(2). When determining the RFC, the ALJ considers "a claimant's physical abilities, mental abilities, [and] symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis." *Weather v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (citing 20 C.F.R. § 404.1545(a)). "[T]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254 (BMC), 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 21, 2014) (quoting *Wichelns v. Comm'r of Soc. Sec.*, No. 12-CV-1595 (NAM/ATB), 2014 WL 1311564, at *6 (N.D.N.Y. Mar. 31, 2014)) (internal quotations omitted). Nevertheless, ALJs are not medical professionals. *See Heather R. v. Comm'r of Soc. Sec.*, 19-CV-01555 (EAW), 2021 WL 671601, at *3 (W.D.N.Y. Feb. 22, 2021). The ALJ must refrain "from 'playing doctor' in the sense that [he] 'may not substitute his own judgment for competent medical opinion.'" *Quinto v. Berryhill*, No. 17-CV-00024 (JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) (quoting *Staggers v. Colvin*, No. 14-CV-00717 (SALM), 2015 WL 4751108, at *3 (D. Conn. June 17, 2015), *report and recommendation adopted*, 2015 WL 4751123 (D. Conn. Aug. 11, 2015)). Accordingly, unless the claimant has more than "minor physical impairments," *Jaeger-Feathers v. Berryhill*, 17-CV-06350 (JJM), 2019 WL 666949, at *4 (W.D.N.Y. Feb. 19, 2019), an ALJ is not qualified "to assess residual functional capacity on the basis of bare medical findings," *Kinslow v. Colvin*, No. 12-CV-1541 (GLS/ESH), 2014 WL 788793, at *5 (N.D.N.Y. Feb. 24, 2014). Very specific RFC assessments, such as limitations on off-task time, must be based on evidence in the record, rather than on "the

ALJ's own surmise." *See Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (summary order).

After "careful consideration of the entire record," the ALJ determined that Plaintiff had an RFC to perform sedentary work "except she could never climb ladders, ropes, or scaffolds," "could occasionally climb ramps, stairs, balance, stoop, kneel, crouch, and crawl," she "needed to use a cane in the right, dominant hand for balance," and she was "further limited to environmental restrictions, such as fumes, odors, dusts, and gases." (R. 19). The ALJ relied on extensive evidence, including Plaintiff's testimony, medical records, and multiple consultative examinations in making the RFC determination. (*See* R. 19-26, citing R. 186-92 (disability report); 195-204 (function report); 264-66 (progress notes); 259-63, 317-480, 707-36 (treatment records); 267-69 (MRI); 270-308, 737-48 (physical therapy treatment records); 61-68, 70-84, 481-78, 679-84 (consultative examination records)). The evidence set forth in these records is sufficient to establish substantial evidence in support of the ALJ's RFC determination. *See, e.g., Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 25 (2d Cir. 2019) (summary order) (RFC for sedentary work with limitations supported by substantial evidence where ALJ considered "medical evidence, including testing and clinical exam findings," consultative examiner reports, and the plaintiff's testimony). Plaintiff does not challenge the weight the ALJ applied to any of this evidence, but rather the conclusions drawn from it. The Court addresses each of these criticisms in turn.

## 1. The ALJ's Sedentary Work Determination Was Supported By Substantial Evidence

Plaintiff argues that the ALJ errantly concluded that she could perform sedentary work due to record findings regarding a limited ability to stand and walk. (Pl. Br. at 17-18). The

Commissioner replies that the ALJ expressly considered the treatment records and examination findings cited by Plaintiff, including her need to use a cane. (Comm'r Br. at 17-18).

Plaintiff cites to: (1) the MRI findings of her right knee; (2) her surgical record; (3) Dr. Healy's consultative examination report; (4) Dr. Cushner's treatment records; and (5) Dr. Schulman's consultative examination report.  (Pl. Br. at 17-18).  The ALJ "careful[ly] consider[ed]" all of this information, in addition to the other extensive documentation before her, in arriving at her conclusion that Plaintiff could perform sedentary work with additional limitations. (*See* R. 19-26).  The record generally indicated that Plaintiff was capable of limited standing and walking. (*See* R. 47 (Plaintiff testified that she can walk with a cane for about two blocks, stand for 20-25 minutes without pain); R. 200-01 (Plaintiff's function report, indicated she can walk up to three blocks or one mile with cane, can stand up to ten minutes, can sit up to half hour); R. 66 (Dr. Li opined that Plaintiff can stand and/or walk with normal breaks for a total of two hours and sit with normal breaks for a total of six hours); R. 80 (Dr. Schwartz concluded the same); R. 75-76 (Dr. Blumenfeld opined that Plaintiff had an RFC for sedentary work); R. 682 (Dr. Healy opined that Plaintiff had moderate to marked limitations sitting, standing, walking, and climbing stairs); R. 566, 575 (Plaintiff reported difficulties with prolonged walking and "startup discomfort" for first few steps to Dr. Cushner)).  Based on this evidence, the ALJ concluded that Plaintiff could perform sedentary work with additional limitations, including the use of a cane in her right dominant hand for balance. (R. 19). Sedentary work generally requires walking and standing "occasionally"—meaning "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday." SSR

96-9p, 1996 WL 374185, *3 (July 2, 1996).  Accordingly, the ALJ's determination that Plaintiff could perform sedentary work was supported by substantial evidence.

Plaintiff seems to suggest, without support, that the ALJ erred in failing to include off-task time of 15 percent or more of the day in her RFC. (*See* Pl. Br. at 18).  At the hearing, the VE testified that an individual of Plaintiff's background, characteristics, and limitations could not perform Plaintiff's past work or other sedentary jobs in the national economy if the individual needed to take unscheduled breaks outside of normal eight-hour breaks that amounted to more than 15 percent of the work day. (R. 57-58).  However, as noted above, the ALJ's RFC determination as to standing and walking was supported by substantial evidence in the record. Plaintiff does not present any contradictory evidence supporting off-task time.  *See Lesanti v. Comm'r of Soc. Sec.*, 436 F. Supp. 3d 639, 650 (W.D.N.Y. 2020) ("It is ultimately Plaintiff's burden to prove a more restrictive RFC than the RFC assessed by the ALJ.").  It is the ALJ's role to "weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order).  The ALJ did not commit error in "declining to incorporate greater restrictions for…staying off-task." *Tamara M. v. Saul*, 19-CV-1138 (CFH), 2021 WL 1198359, at *11 (N.D.N.Y. Mar. 30, 2021) (no error where "the ALJ merely declined to include limitations…as he concluded that such limitations were not supported by the medical record"); *Maria S. v. Kijakazi*, No. 21-CV-0177 (DEP), 2022 WL 4619861, at *9 (N.D.N.Y. Sept. 30, 2022) (no error in declining to include off-task time where no indication in opinions or treatment notes "that would appear to support a need for extensive off-task time or absences" and "off-task time or absences are not supported by the evidence as a whole").

**2.  The ALJ's RFC Sufficiently Stated Plaintiff's Environmental Limitations**

Plaintiff also argues that the ALJ's RFC was impermissibly vague because it "failed to adequately define what constituted limitations to environmental restrictions in work-related terms." (Pl. Br. at 16).  The Commissioner replies that the ALJ's RFC assessed environmental restrictions are consistent with relevant SSA policy. (Comm'r Br. at 18-19).

The ALJ determined that Plaintiff's asthma was a severe impairment. (R. 18).  The ALJ's RFC stated that Plaintiff was "limited to environmental restrictions, such as fumes, odors, dusts, and gases." (R. 19).  This limitation was identical to the hypothetical posed to the VE. (R. 57).  Moreover, it was supported by documentation in the record indicating that Plaintiff had a history of asthma and should avoid respiratory irritants, dust and smoke (R. 81-82, 679-82).  Therefore, the ALJ's environmental limitation was supported by substantial evidence.

Plaintiff argues that SSR 96-8p requires the ALJ to use "work-related" terms with respect to Plaintiff's environmental limitations. (Pl. Br. at 16).  The SSA has defined an "environmental limitation" to be "[a]n *impairment-related* inability to tolerate exposure to one or more environmental conditions in a workplace." SSA, THE PROGRAM OPERATIONS MANUAL SYSTEM ("POMS"), DI 25001.001 *Medical and Vocational Quick Reference Guide* (emphasis added).[5]  Environmental conditions are "[c]onditions that may exist in work environments such as extremes in temperature, humidity, noise, vibrations, fumes, odors, presence of toxic substances, dust, poor ventilation, or hazards." *Id*.  Environmental limitations are considered elements of an individual's nonexertional capacity. SSR 96-8p, 1996 WL 374184, *6.

---

[5] *See* https://secure.ssa.gov/poms.nsf/lnx/0425001001 (last visited Dec. 21, 2022).  POMS is the "SSA's primary manual of policy and procedures for the Agency's field personnel." *See* SSA, "Program Policy Documents," https://www.ssa.gov/OP_Home/#:~:text=The%20Program%20Operations%20Manual%20System,handling%20appeals%20of%20Agency%20decisions (last visited Dec. 21, 2022).

SSR 83-14 provides guidance on how to evaluate a combination of a severe exertional impairment and a nonexertional impairment or restriction. SSR 83-14, 1983 WL 31254, *1 (Jan. 1, 1983). SSR 83-14 notes that a "[p]hysical limitation of function may be linked with an environmental restriction (*e.g.*, a respiratory impairment may diminish exertional capacity as well as restrict a person to types of work not requiring exposure to excessive dust or fumes)." *Id.* at *2. SSR 83-14 then defines "environmental demands" to include "working conditions…which a person may not be able to tolerate as a result of an impairment includ[ing] exposure to extremes of heat or cold, humidity, noise, vibration, hazards, fumes, dust, and toxic conditions." *Id.* Here, the ALJ followed this guidance in assessing environmental limitations concerning Plaintiff's workplace conditions in limiting exposure to "fumes, odors, dusts, and gases." (R. 19). Thus, the RFC sufficiently stated Plaintiff's environmental limitations.

Accordingly, the Court respectfully recommends finding that the ALJ's RFC determination is supported by substantial evidence.

**E.  Plaintiff's Arguments Regarding the ALJ's Step Five Determinations**

The Commissioner bears the burden at step five of demonstrating that there are a significant number of jobs in the national economy that Plaintiff can perform. *Talavera*, 697 F.3d at 151. In fulfilling this burden, "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence ... and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (summary order) (citations omitted).

**1.  The ALJ Properly Concluded Plaintiff Could Perform Sedentary Work With Additional Limitations**

Plaintiff argues that the ALJ erred in concluding that she could perform the jobs of addressing clerk, cutter and paster, and call-out operator with limitations. (Pl. Br. at 16).

Specifically, Plaintiff claims that because she requires a cane for balance on her right dominant side, she is unable to frequently handle as required by the positions. (*Id.*). The Commissioner counters that the ALJ's finding is supported by substantial evidence because the hypothetical question mirrored the RFC determination and the ALJ specifically questioned the VE regarding whether an individual who uses a cane for balance can perform the three identified jobs. (Comm'r Br. at 19-21).

Plaintiff argues that SSR 96-9p "establishes that the occupational base for an individual who must use [a cane] for balance because of significant involvement of the lower extremities would be significantly eroded." (Pl. Br. at 16). However, that ruling specifically notes that "an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand" because "most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds." SSR 96-9p, 1996 WL 374185, *7. SSR 96-9p further explains that:

> For example, *an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee),* or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions *may still have the ability to make an adjustment to sedentary work that exists in significant numbers*. On the other hand, the occupational base for an individual who must use such a device for balance because of *significant involvement of both lower extremities* (*e.g.*, because of a neurological impairment) *may* be significantly eroded. In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

*Id.* (emphasis added). Here, it is uncontested that Plaintiff requires a cane for balance because of an impairment affecting only her right knee. SSR 96-9p, thus, does not, as Plaintiff argues, even contemplate that her occupational base for sedentary work "*may* be significantly eroded."

Furthermore, even if SSR 96-9p did contemplate potential erosion, the ALJ properly consulted with a VE "in order to make a judgment regarding [Plaintiff's] ability to make an adjustment to other work." *Id*. The ALJ asked the VE to assume, amongst other limitations, that an individual with Plaintiff's RFC "[w]ould need to use a cane in the right dominant hand for balance." (R. 57). In response, the VE identified the jobs of addressing clerk, cutter and paster, and call-out operator. (*Id.*). This hypothetical reflected all of Plaintiff's limitations and was incorporated into the ALJ's RFC. (*See* R. 19-26, 57). The ALJ, therefore, did not err in finding that Plaintiff could perform sedentary work with limitations, including a cane. *See Magby v. Colvin*, 15-CV-285 (FPG), 2016 WL 4585903, at *3 (W.D.N.Y. Sept. 2, 2016) (finding no error where the ALJ "accounted for [plaintiff's] cane use in the RFC determination," "complied with the suggestion in SSR 96-9p that an ALJ should consult a VE to determine whether an individual who needs to use a cane can adjust to other work," and "posed a hypothetical question to the VE that included the caveat that 'the individual would use a cane to ambulate'").

## 2. The ALJ Identified Jobs That Exist in Significant Numbers in the National Economy

Plaintiff claims that the Commissioner failed to carry her burden at step five to identify jobs that exist in significant numbers in the national economy that Plaintiff could do because the jobs of addressing clerk and call-out operator do not exist in significant numbers. (Pl. Br. at 19). The Commissioner counters that the ALJ's step five determination was supported by substantial evidence because it was reasonable for the ALJ to conclude that 17,300 jobs in the national economy constituted a significant number. (Comm'r Br. at 21-22).

While "[t]he regulations provide no threshold or criteria for what number of jobs in the national economy constitute 'significant numbers,'" courts "have generally held that what constitutes a significant number is 'fairly minimal.'" *Brodie v. Comm'r of Soc. Sec.*, 19-CV-

06968 (PAE) (RWL), 2020 WL 5754607, at *8 (S.D.N.Y. Aug. 25, 2020), *report and recommendation adopted*, 2020 WL 5775234 (S.D.N.Y. Sept. 28, 2020) (quoting *Rosa v. Colvin*, No. 12-CV-0170 (LEK/TWD), 2013 WL 1292145, at *9 (N.D.N.Y. Mar. 27, 2013)).  "The Commissioner need show only one job existing in the national economy that [Plaintiff] can perform." *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (summary order); *see* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b).

Here, the Commissioner has satisfied that burden.  In response to the hypothetical, the VE identified three jobs that someone of Plaintiff's age, background, and RFC could do: addressing clerk (3,000 jobs nationally), cutter and paster (11,000 jobs nationally), and call-out operator (3,300 jobs nationally). (R. 57).  The ALJ's decision incorporates the same information in concluding that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 27).  Plaintiff only challenges the significance of the addressing clerk and call-out operator positions. (Pl. Br. at 19).  Even if this Court concluded, as some courts have, that approximately 3,000 positions is not significant (*see, e.g., Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 231 (N.D.N.Y. 2015) (finding 5,160 jobs in national economy not significant)), the ALJ identified a third position—cutter and paster— that had 11,000 jobs nationally.  Courts have found similar numbers to be significant. *See Sanchez v. Berryhill*, 336 F. Supp. 3d 174, 177 (W.D.N.Y. 2018) (noting that "numbers similar to those presented here – between 9,000 and 10,000 jobs – have typically been found to be sufficiently 'significant' to meet the Commissioner's burden") (collecting cases).  Furthermore, "[t]he Commissioner need show only one job existing in the national economy that [Plaintiff] can perform." *See Bavaro*, 413 F. App'x at 384.  Moreover, "the total number of jobs comprised collectively by the three representative positions" is significant. *Brodie*, 2020 WL 5754607, at *8.  Accordingly,

the Court concludes and respectfully recommends finding that the Commissioner satisfied her burden at step five of identifying jobs that exist in significant numbers in the national economy that Plaintiff could do.

### 3. The ALJ's Hypothetical Reflected Plaintiff's Limitations

Plaintiff argues that the ALJ improperly relied on the VE's testimony because the ALJ's hypothetical, upon which the VE's testimony was based, did not accurately reflect her limitations. (Pl. Br. at 20).  The Commissioner replies that the hypothetical mirrored the RFC determination, and thus Plaintiff's argument on this point is merely "reiterating [her] disagreement with the ultimate RFC determination." (Comm'r Br. at 19).

An ALJ properly relies on the VE's testimony "regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence…and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese*, 358 F. App'x at 276 (internal citations omitted).  Here, the hypothetical posed to the VE was identical to the RFC. *Compare* R. 19 *with* R. 57.  As set forth above, the ALJ's RFC assessment is supported by substantial evidence, and thus the hypothetical was proper. *Calabrese*, 358 F. App'x at 277 ("As this RFC assessment is supported by substantial evidence, the content of the ALJ's hypotheticals was entirely proper.").  Accordingly, the Court concludes and respectfully recommends finding that it was proper for the ALJ to rely on the VE's testimony.

## III.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that Plaintiff's motion for judgment on the pleadings be denied and the Commissioner's cross-motion be granted.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time).  A party may respond to another party's objections within fourteen (14) days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:    December 21, 2022
              White Plains, New York

RESPECTFULLY SUBMITTED:

JUDITH C. McCARTHY
United States Magistrate Judge